UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

eACCELERATION CORPORATION,

               Plaintiff,

v.

TREND MICRO, INCORPORATED,

               Defendant.

No.  C05-1543Z

ORDER

     This matter comes before the Court on Plaintiff eAcceleration Corporation's ("eAcceleration") motion for a preliminary injunction seeking to bar Defendant Trend Micro Incorporated ("Trend") from the allegedly unlawful use of a trademark.  Docket no. 8. Having reviewed eAcceleration's motion, Trend's opposition thereto, docket no. 12, and eAcceleration's reply, docket no. 18, the Court enters the following Order.

## BACKGROUND

     eAcceleration brings this action against Trend for the following claims: trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114; unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); trademark dilution under § 43(c) of the Lanham Act, 11 U.S.C. § 1125(c); state trademark dilution under RCW 19.77.160; state common law and statutory unfair competition.  Am. Compl., docket no. 6, ¶¶ 12-63.  eAcceleration's Complaint seeks a permanent injunction against Trend's use of a red octagonal stop sign,

ORDER   -1-

1  restitution of profits, treble damages, and fees and costs.  Id. at p. 11.  In the instant motion,

2  eAcceleration seeks a preliminary injunction barring Trend from using the red octagonal stop

3  sign, which currently appears on the packaging of Trend's anti-virus product.  See Chen

4  Decl., docket no. 15, Ex. D (example of Trend's packaging).

5    eAcceleration and the Stop-Sign Marks

6    eAcceleration is a Delaware corporation with its principal place of business located in

7  Poulsbo, Washington.  Am. Compl., at ¶ 1.  eAcceleration produces and sells computer

8  security software products over the internet.  Id.  At issue here are trademarks used by

9  eAcceleration in marketing its products.  First, eAcceleration owns a registered trademark

10  consisting of the phrase "StopSign."  Ballard Decl., docket no. 9, at ¶ 4 (Reg. No.

11  2,993,031).  Second, eAcceleration owns an unregistered mark in a graphic image consisting

12  of a red octagon with white trim and the word "STOP" in the center ("Stop-Sign Image").

13  Id. at Ex. B.  eAcceleration has a registration application pending before the U.S. Patent and

14  Trademark Office for the Stop-Sign Image.  Id. at ¶ 4.  eAcceleration has used these two

15  marks to market its computer security software products since mid-2002.  Id. at ¶ 5.   In

16  2003-2004, eAcceleration developed and launched an advertising campaign that included

17  television commercials featuring the marks.  Id. at ¶¶ 7-8.  The campaign, which directs

18  customers to eAcceleration's web site (www.stopsign.com), has cost eAcceleration

19  approximately $7.5 million.  Id.  eAcceleration does not sell its products in retail stores.

20    Trend and the Stop-Sign Photo

21    Trend is a California corporation that produces and sells computer security software

22  and services.  Am. Compl., at ¶ 2.  Trend's consumer and home office product line is known

23  as PC-cillin, which is a registered trademark.  Chen Decl., docket no. 15, at ¶¶ 2-4.  The PC-

24  cillin products include anti-virus, anti-spam, firewall, and anti-spyware components that may

25  be purchased separately at retail stores or on the internet.  Id. at ¶ 3.  Trend also markets its

26  products using the TREND MICRO and Trend Micro logo trademarks, which are registered.

1   <u>Id.</u> at Exs. A, B.  Trend does not claim an interest in, or use of, trademarks consisting of the

2   phrase "StopSign" or the Stop-Sign Image.  However, the packaging on one of Trend's PC-

3   cillin products, the anti-virus software, includes a photograph of an actual stop sign atop a

4   wood post taken from an angle below the sign ("Stop-Sign Photo").  <u>Id.</u> at Ex. D.  Trend

5   states that it developed this anti-virus packaging with the help of a graphic design company

6   during a period from March-June 2004 without any knowledge of the existence of

7   eAcceleration's products or marks.  <u>Id.</u> at ¶¶ 6-9; Tazuma Decl., docket no. 14, at ¶ 9.

8   During the period leading up to this litigation, Trend also placed Stop-Sign Photos on the

9   web page for its "Enterprise" products, which are directed at large corporate consumers.

10  Ballard Decl., at ¶ 14.  Those images have since been removed and, therefore, are not the

11  subject of this preliminary injunction motion.  Pl.'s Mot., docket no. 8, at 4.

12          Trend's Motion to Strike

13          In its response brief, Trend objects to eAcceleration's references to settlement

14  negotiations that occurred before this litigation was initiated.  Docket no. 12, at 7.  Trend

15  argues that these references are inadmissible under FRE 408, which excludes "[e]vidence of

16  (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to

17  accept, a valuable consideration in compromising or attempting to compromise a claim

18  which was disputed as to either validity or amount."  However, FRE 408 does not apply

19  where the evidence is used for a purpose other than proving the validity or amount of a

20  claim, such as "negativing a contention of undue delay."  Given this exception, Trend's

21  motion to strike is DENIED to the extent evidence of prior settlement demands or

22  negotiations relates to eAcceleration's delay in bringing these claims.

23  **DISCUSSION**

24          A preliminary injunction is appropriate where the movant can demonstrate either "(1)

25  a likelihood of success on the merits and the possibility of irreparable injury; or (2) that

26  serious questions going to the merits were raised and the balance of hardships tips sharply in

1   its favor." Clear Channel Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir.

2   2003) (internal citation omitted).  These two formulations represent two points on a sliding

3   scale in which the required degree of irreparable harm increases as the probability of success

4   decreases.  Sammartano v. First Jud. Dist. Ct., 303 F.3d 959, 965 (9th Cir. 2002) (internal

5   citation and quotation omitted).  The Court must also examine whether the public interest

6   favors the movant.  Id.

7   I.      Likelihood of Success on the Merits

8           In this case, eAcceleration's arguments as to the merits are conceptually divided into

9   two claims.  First, eAcceleration's trademark infringement, unfair competition, and trade

10  dress claims all rest on the contention that Trend's use of the Stop-Sign Photo is confusingly

11  similar to eAcceleration's Stop-Sign Image.  Second, eAcceleration's trademark dilution

12  claim is based on the argument that (1) the Stop-Sign Image is famous and distinctive, (2)

13  Trend adopted its use of the Stop-Sign Photo after eAcceleration's Stop-Sign Image became

14  famous, and (3) Trend's use of the Stop-Sign Photo caused dilution of eAcceleration's mark.

15  See 15 U.S.C. § 1125(c).  In its opening brief, eAcceleration suggests that there is a strong

16  likelihood of success on the merits for both the infringement/unfair competition/trade dress

17  claims and the dilution claim.  In opposition to the motion, Trend contends that

18  eAcceleration is unlikely to prevail on any of the claims and also raises a separate "fair use"

19  defense.

20          A.  Trademark Infringement, Unfair Competition, and Trade Dress Claims

21          The elements necessary to establish trademark infringement and unfair competition

22  claims are identical.  Brookfield Comm., Inc. v. West Coast Enter. Corp., 174 F.3d 1036,

23  1046 n. 6, 1047 n. 8 (9th Cir. 1999).  Federal trademark infringement claims under § 32 of

24  the Lanham Act apply to registered marks, while unfair competition claims under § 43(a) of

25  the Lanham Act apply to both registered and unregistered marks and protect against a wider

26  range of practices.  Id.; see also 15 U.S.C. § 1114; 15 U.S.C. § 1125(a)(1).  In both cases, the

1   plaintiff must "prove [1] the existence of a trademark and [2] the subsequent use by another

2   in a manner likely to create consumer confusion." Comedy III Prod., Inc. v. New Line

3   Cinema, 200 F.3d 593, 594 (9th Cir. 2000).  Here, eAcceleration's motion relies on its claim

4   that Trend's Stop-Sign Photo makes improper use of eAcceleration's unregistered Stop-Sign

5   Image mark; there appears to be no serious allegation that Trend makes use of

6   eAcceleration's registered "StopSign" mark.  Because § 32 of the Lanham Act (trademark

7   infringement) applies *only* to registered marks, the Court concludes that eAcceleration's

8   motion is limited to the unfair competition claim against Trend under § 43(a) of the Lanham

9   Act, which applies to both registered and unregistered marks.

10         Washington State courts have also adopted the "likelihood of confusion" test for

11   common law and statutory unfair competition claims.  See Pioneer First Fed. Sav. and Loan

12   Ass'n v. Pioneer Nat'l Bank, 98 Wn.2d 853, 860 n. 1 (1987) (Washington State follows the

13   likelihood of confusion standard for trademark infringement claims); Nordstrom, Inc. v.

14   Tampourlos, 107 Wn.2d 735, 742-43 (1983) (trade name infringement sufficient to meet the

15   public interest component under Washington State Consumer Protection Act).

16         Finally, a trade dress infringement claim requires a plaintiff to satisfy the same

17   elements as a trademark infringement claim with one additional requirement: the trade dress

18   must be non-functional (i.e., not essential to the use or purpose of the product).  15 U.S.C. §

19   1125(a)(3); Mattel, Inc. v. Walking Mountain Productions, 353 F.3d 792, 810 n. 18 (9th Cir.

20   2003).  Trend does not argue that eAcceleration's use of the stop sign trade dress is

21   functional.  Accordingly, as with unfair competition, validity of the mark and likelihood of

22   confusion are the dispositive elements.

23              1.  Validity of eAcceleration's Stop-Sign Image as a Mark

24         To prevail on an unfair competition claim, a plaintiff must first establish that it has a

25   valid mark that is either registered or unregistered.  Comedy III Prod., 200 F.3d at 594;

26   Brookfield Comm., 174 F.3d 1046-47, n. 8.  In its opening motion, eAcceleration assumes

ORDER   -5-

1  that its trademark interest in the Stop-Sign Image is "presumptively valid and legally

2  protected." Pl.'s Mot., at 6. However, Trend argues that the Stop-Sign Image is not a

3  protectable mark because (1) the use of stop signs are common in the industry (citing the 28

4  examples); (2) eAcceleration's Stop-Sign Image is a generic, common symbol; and (3)

5  eAcceleration has not proven that its Stop-Sign Image has acquired a secondary meaning in

6  the minds of consumers. Def.'s Resp., at 10-15.

7      Trend's first two arguments are essentially one in the same: eAcceleration's Stop-Sign

8  image is not distinctive and, therefore, not protectable. To be a protected mark, an image

9  must be capable of distinguishing the holder's goods from the goods of others. Kendall-

10  Jackson Winery v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 (9th Cir. 1998). In Kendall-

11  Jackson, the plaintiff's purported mark was a grape leaf that was placed on its bottled wine

12  products. Id. at 1045. Defendant argued that the use of a grape leaf was not protectable in

13  the wine industry. Id. 1047. The Kendall-Jackson Court concluded that a grape leaf was

14  generally "suggestive"[1] in that it requires multiple steps of logic to associate grape leaves

15  with bottled wine, but the Court held that the grape leaf emblem had passed into a "generic"

16  (non-protectable) status because it was so widely used in the industry. Id.

17      In this case, Trend argues that the use of a stop sign on computer security software

18  packaging is, or has become through wide-spread use, generic and un-protectable. See White

19  Decl., docket no. 16, Exs. A-BB (28 examples of red octagon use in computer security

20  software marketing). In response, eAcceleration contends that the use of a stop sign is

21  suggestive because one must go through several steps of logic to associate the image with the

22  product, as with the grape leaf in Kendall-Jackson. eAcceleration also argues that Trend's

23  examples of other red octagon images are insufficient to prove wide-spread use, where the

24

25      [1] Marks that are "suggestive," "arbitrary," or "fanciful" are deemed inherently distinctive
    and deserving of protection. Id. at 1047. Marks that are merely "generic" or "descriptive" are
26  generally not protectable unless they have acquired a secondary meaning in the minds of
    consumers. Id.

vast majority of those examples are not related to anti-virus software, which is the subject of this litigation, and Trend has not established when the 28 examples came into use. eAcceleration is correct that the facts before the Court do not indicate the kind of wide-spread use of stop signs on anti-virus software analogous to the grape leaves commonly used on wine bottles as in Kendall-Jackson.  The Stop-Sign Image therefore falls in the "suggestive" category of trademarks and there is a strong likelihood eAcceleration's Stop-Sign Image may be a valid and protectable mark.  Thus, the dispositive issue is the degree to which eAcceleration can establish a likelihood of confusion between eAcceleration's unregistered Stop-Sign Image mark and Trend's Stop-Sign Photo.[2]

### 2.  Likelihood of Confusion

The likelihood of confusion inquiry requires a factual determination.  Thane Int'l, Inc. v. Trek Bicycle Corp., 305 F.3d 894, 901 (9th Cir. 2002).  In trademark infringement cases, the Ninth Circuit has cautioned that, in making this determination, a "careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record."  Thane, 305 F.3d at 901-02.  In an effort to help courts and juries evaluate the "likelihood of confusion" element, the Ninth Circuit has adopted an eight factor test, which was first articulated in AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979) (abrogated in part on other grounds by Matel, Inc. v. Walking Mountain Prod., 353 F.3d 792 (2003)).  The so-called Sleekcraft factors are:

(a) the strength of the mark;
(b) the similarity of the marks;
(c) the proximity or relatedness of the goods or services;
(d) the defendant's intent in selecting its mark;
(e) evidence of actual confusion;
(f) the marketing channels used;
(g) the likelihood of expansion into other markets; and
(h) the degree of care purchasers are likely to use.

---

[2] Trend's third argument—that eAcceleration's Stop-Sign Image has acquired no secondary meaning—is applicable only if Trend is correct in characterizing the Stop-Sign Image as generic.  Because the Stop-Sign Image is not generic, the "secondary meaning" analysis is not applicable.

ORDER   -7-

1    599 F.2d at 348-49.  "This eight-factor test for likelihood of confusion is pliant.  Some

2    factors are much more important than others, and the relative importance of each individual

3    factor will be case-specific."  Brookfield Comm., 174 F.3d at 1054.  For example, in cases

4    involving trademarks used to sell internet services over competing web sites, the Ninth

5    Circuit has identified the similarity of the marks, the relatedness of the services, and the use

6    of common marketing channels as the most important factors.  GoTo.com, Inc. v. Walt

7    Disney Co., 202 F.3d 1199, 1205 (2000) (parties offering competing search engines).

8    Ultimately, the task on a motion for a preliminary injunction is to review each factor in turn

9    and determine whether, taken as a whole, there is or is not a probability of success on the

10   merits or serious questions as to the merits of the likelihood of confusion element.

11                     a.  The Strength of eAcceleration's Stop-Sign Image Mark

12           The strength of the mark is determined by placing it in one of four possible categories.

13   From weakest to strongest, those categories are (1) generic, (2) descriptive, (3) suggestive,

14   and (4) arbitrary or fanciful.  GoTo.com, 202 F.3d at 1207.  Arbitrary or fanciful marks are

15   inherently distinctive and entitled to the highest protection.  Sleekcraft, 599 F.2d at 349.  In

16   contrast, suggestive marks subtly connote something about the product and are less

17   distinctive than arbitrary or fanciful marks.  Id.  Suggestive marks are presumptively weak

18   but still entitled to protection, particularly where the holder has expended substantial

19   resources to promote the mark.  Brookfield Comm., 174 F.3d at 1058.  "Descriptive marks

20   define qualities or characteristics of a product in a straightforward way that requires no

21   exercise of imagination to be understood."  Kendall-Jackson, 150 F.3d at 1047 n. 8.

22   eAcceleration contends that its Stop-Sign Image falls in the "suggestive" category because it

23   is a metaphor for computer anti-virus protection.  eAcceleration also maintains that its marks

24   have gained greater strength in the marketplace through its expenditure of millions of dollars

25   to advertise its products.  With very little discussion, Trend states that eAcceleration's marks

26   are "extraordinarily weak," relying on the similar uses of red octagon symbols by others in

1   the computer security industry.  As discussed above, eAcceleration's Stop-Sign Image should

2   fall in the "suggestive" category, meaning the mark is entitled to protection.  Thus, this factor

3   will likely weigh in favor of eAcceleration.

4                  b.  <u>The Similarity between eAcceleration's Mark and Trend's Photo</u>

5         The more similar the marks in terms of appearance, sound, and meaning, the greater

6   the likelihood of confusion.  <u>Id.</u> at 154.  "In analyzing this factor, 'the marks must be

7   considered in their entirety and as they appear in the marketplace,' with similarities weighed

8   more heavily than differences."  <u>Id.</u> (quoting <u>Official Airline Guides, Inc. v. Goss</u>, 6 F.3d

9   1385, 1392 (1993)).  The similarity of the marks has often been considered "a critical

10  question in the likelihood-of-confusion analysis."  <u>GoTo.com</u>, 202 F.3d at 1205; <u>see also</u>

11  <u>Brookfield Comm.</u>, 174 F.3d at 1054 (where two marks are entirely dissimilar, there is no

12  likelihood of confusion).

13        There are both similarities and dissimilarities between the eAcceleration's Stop-Sign

14  Image and Trend's Stop-Sign Photo.  The obvious similarity is that both are red octagonal

15  signs with the word "STOP" printed in white.  However, eAcceleration uses a small

16  computer-generated image from a head-on view that appears next to the phrase "StopSign."

17  Ballard Decl., at Ex. C.  In contrast, Trend uses a photograph of an actual stop sign bolted to

18  a wooden post, which is taken from an off-center angle below the sign.  Chen Decl., at Ex.

19  D.  This photograph does not accompany Trend's other trademarks.  As the <u>GoTo.com</u> court

20  noted, the marks must be compared as they appear in the marketplace.  202 F.3d at 1206.

21  eAcceleration's products and Stop-Sign Image appear on its website.  Trend's Stop-Sign

22  Photo appears on the packaging for its PC-cillin anti-virus software sold on store shelves and

23  over Trend's website.  Although there is enough similarity for this factor to weigh in

24  eAcceleration's favor, there is sufficient dissimilarity so the factor does not weigh heavily in

25  eAcceleration's favor.

26

c. The Proximity and Relatedness of the Parties' Goods and Services

The Brookfield Communications Court stated that "[r]elated goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." 174 F.3d at 1055. However, even where the marks are identical, "there may be no consumer confusion—and thus no trademark infringement—if the alleged infringer is in a different geographic area or in a wholly different industry." Id. at 1054. Here, eAcceleration and Trend are near-direct competitors. Trend attempts to find a distinction in the fact that eAcceleration generally packages its anti-virus software with other services. However, as eAcceleration correctly notes in reply, a customer purchasing one product or the other is unlikely to purchase both. Thus, this factor is likely to weigh in favor of eAcceleration.

d. Trend's Intent in Selecting the Stop-Sign Photo

The Sleekcraft court stated that "when the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, the public will be deceived." 599 F.2d at 354. However, "an intent to confuse customers is not required for a finding of trademark infringement." Brookfield, 174 F.3d at 1059. Thus, the intent factor, if present, will weigh heavily in favor of finding a likelihood of confusion but, if absent, will generally have no effect. Id. In this case, eAcceleration provides no direct evidence of Trend's intent to capitalize on its Stop-Sign Image mark. eAcceleration suggests only that intent may be inferred because Trend adopted its use of the Stop-Sign Photo approximately six months after eAcceleration began its advertising campaign. eAcceleration cites no authority suggesting that intent may be inferred in such circumstances. In contrast, Trend denies having any knowledge of eAcceleration or its marks when selecting the Stop-Sign Photo. See Chen Decl. at ¶ 10; Tazuma Decl. at ¶ 9. Accordingly, this factor is neutral because eAcceleration provides no evidence of intent and Trend provides declarations specifically denying any intent to make use of eAcceleration's mark.

1            e.  Evidence of Actual Confusion

2        While "[e]vidence of actual confusion is relevant to the issue of likelihood of

3  confusion, [] the absence of such evidence need not create an inference that there is no

4  likelihood of confusion."  E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292

5  (9th Cir. 1992).  However, when the duration of non-confusing co-existence stretches into

6  years, the inference against finding a likelihood of confusion strengthens.  3 J. Thomas

7  McCarthy, McCarthy on Trademarks, § 23:18 (4th ed. 2005); see also Brookfield

8  Communications, 174 F.3d at 1050 (noting that there is probably no more persuasive

9  evidence of non-confusion than that the two marks had been used simultaneously for five

10 years without causing any consumers to become confused).  Here, Trend's Stop-Sign Photo

11 has been in wide use since late-2004.  eAcceleration concedes that neither party has seen any

12 evidence of actual confusion but argues that such evidence may become available during

13 discovery.  Pl. Reply, docket no. 18, at 8-9.  With no evidence either way, and no discovery

14 having been conducted, this factor is also neutral.

15            f.  The Marketing Channels Used by eAcceleration and Trend

16       Converging marketing channels increase the likelihood of confusion while marketing

17 channels that do not overlap diminish the likelihood of confusion.  See Sleekcraft, 599 F.2d

18 at 353; Accuride Int'l v. Accuride Corp., 871 F.2d 1531, 1537 (9th Cir. 1989).  In Sleekcraft,

19 the Ninth Circuit looked to whether the parties sold goods under the same roof, whether the

20 sales methods were similar, whether the products were in the same price range, and whether

21 the parties employed the same advertising methods.  Id.  There are several differences in the

22 marketing channels used by the parties in this case.  eAcceleration sells its StopSign software

23 on its website in downloadable form and also sells subscription services.  In contrast, Trend's

24 product is sold as packaged hard copies that appear on the store shelves of companies such as

25 Best Buy and CompUSA.  Trend also sells its anti-virus software on the internet but, to the

26 extent those sales make use of the Stop-Sign Photo, they generally involve shipping hard

ORDER   -11-

1   copies of the product to customers.  Also, eAcceleration advertises its product through

2   infomercial television and key-word searches on internet search engines.  Trend does not use

3   these methods of advertising.  Thus, other than the similarities in the price of the goods, the

4   marketing channels used by the parties do not directly overlap and this factor is likely to

5   favor Trend.

6                              g.  Likelihood of Expansion into Other Markets

7          Where there is a strong possibility that either party to a trademark dispute may expand

8   its business to directly compete with the other, such evidence favors finding a likelihood of

9   confusion.  Sleekcraft, 599 F.2d at 354.  When the goods are closely related, any expansion

10  is likely to result in direct competition.  Id.  As a result, this factor is tied to the earlier

11  determination of whether the goods and services are related and sold in close proximity.  As

12  discussed above, eAcceleration and Trend are already in near-direct competition.  Although

13  there is very little room for expansion, it is possible the parties marketing channels could

14  converge.  For instance, eAcceleration could begin selling its products on store shelves.

15  However, eAcceleration has introduced no evidence that is likely to occur.  Without such

16  evidence, this factor does not favor either party in this anaysis.

17                      h.  Degree of Care Used by Purchasers of eAcceleration's StopSign
                            Software and Trend's PC-cillin Anti-Virus Software
18
19         Under the degree of care factor, "likelihood of confusion is determined on the basis of

20  the 'reasonably prudent investor.'"  Brookfield Comm., 174 F.3d at 1060 (quoting

21  Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998)).  The

    reasonably prudent consumer is "expect[ed] to be more discerning—and less easily
22
    confused—when [] purchasing expensive items."  Id.  The parties agree that the price range
23
    for these products is $40.00 to $60.00.  eAcceleration suggests that this is "on the lower end
24
    of the spectrum" in the degree of care analysis, without citation to analogous cases.  Pl.'s
25
    Reply, at 10.  Trend simply argues that the price range is sufficient for an ordinary, prudent
26
    consumer to contemplate the reliability of the product, also without citations.  Def. Opp., at

    ORDER   -12-

1   18. While customers purchasing these products are not likely to be sophisticated experts, the

2   price range is not so low that the products would be bought on impulse.  Thus, this factor is

3   likely to either favor Trend slightly or be neutral.

4                    i.  <u>Probability of Success on the Merits as to "Likelihood of Confusion"</u>

5        The eight factor <u>Sleekcraft</u> test does not overwhelmingly favor eAcceleration in this

6   case, although eAcceleration appears to have the stronger case based on the facts before the

7   Court.  The strength of the Stop-Sign Image mark, the similarity between that mark and

8   Trend's Stop-Sign Photo, and the relatedness of the products are all likely to weigh in favor

9   of eAcceleration.  In contrast, the marketing channels used and the degree of care used by

10  purchasers will likely favor Trend, though not as clearly.  Finally, there are several factors

11  that are neutral, including Trend's intent in selecting the Stop-Sign Photo, the lack of

12  evidence of actual confusion, and the likelihood of expansion into other markets.  As

13  described above, "likelihood of confusion" requires a factual determination.  <u>Thane Int'l</u>, 305

14  F.3d at 901.  Given the pliancy in the factors, eAcceleration cannot clearly establish probable

15  success in proving a likelihood of confusion between its Stop-Sign Image and Trend's Stop-

16  Sign Photo, but its claim is relatively strong given that courts have identified the similarity of

17  the marks and relatedness of goods as factors carrying more weight in cases involving

18  internet business.  <u>GoTo.com</u>, 202 F.3d at 1205.

19               3.  <u>Trademark Infringement, Unfair Competition, and Trade Dress Conclusions</u>

20       eAcceleration is not likely to prevail on its federal trademark infringement claim

21  because trademark infringement under the Lanham Act applies only to registered marks and

22  Trend does not use the registered phrase "StopSign."  With regard to eAcceleration's unfair

23  competition and trade dress claims, it is likely that eAcceleration will be able to show that its

24  unregistered Stop-Sign Image is a suggestive and protectable mark.  Additionally,

25  eAcceleration has the stronger argument as to the "likelihood of confusion" element for its

26  unfair competition and trade dress claims.

1        B. <u>Trademark Dilution Claims</u>

2        In addition to its infringement, unfair competition, and trade dress claims,

3    eAcceleration briefly raises the argument that it is entitled to a preliminary injunction

4    because it is likely to prevail under the Federal Trademark Dilution Act (FTDA).[3]  The

5    FTDA provides as follows:

6        The owner of a famous mark shall be entitled, subject to the principles of
         equity and upon such terms as the court deems reasonable, to an injunction
7        against another person's commercial use in commerce of a mark or trade name,
         if such use begins after the mark has become famous and causes dilution of the
8        distinctive quality of the mark, and to obtain such other relief as is provided in
         this subsection.
9

10   15 U.S.C. § 1125(c)(1).  The statute further defines "dilution" as "the lessening of the

11   capacity of a famous mark to identify and distinguish goods or services, regardless of the

12   presence or absence of—(1) competition between the owner of the famous mark and other

13   parties; or (2) likelihood of confusion, mistake, or deception."  15 U.S.C. § 1127.

14       Under the FTDA, a plaintiff must prove the following: (1) the marks are identical or

15   nearly identical; (2) plaintiff's mark is famous and distinctive; (3) defendant is making

16   commercial use of the mark; (4) defendant's use began after the plaintiff's mark became

17   famous; and (5) defendant's use presents a likelihood of dilution of distinctiveness.  <u>Thane</u>

18   <u>Int'l , Inc. v. Trek Bicycle Corp.</u>, 305 F.3d 894, 905-12 (9th Cir. 2002).  In this case, the

19   parties appear to dispute only the second element—whether eAcceleration's Stop-Sign Image

20   is famous and distinctive.  However, the analysis by both parties is cursory.

21       The FTDA provides a non-exclusive list of factors that courts may consider in

22   determining whether a plaintiff's mark is "distinctive and famous":

23   (A) the degree of inherent or acquired distinctiveness of the mark;
     (B) the duration and extent of use of the mark in connection with the goods or services;
24   (C) the duration and extent of advertising and publicity of the mark;
     (D) the geographical extent of the trading area in which the mark is used;
25   (E) the channels of trade for the goods or services with which the mark is used;

26   _____

         [3] eAcceleration does not offer further discussion of the dilution claim in its reply brief.

ORDER   -14-

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom an injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered.

15 U.S.C. § 1125(c)(1)(A)-(H).  The definition of "fame in the dilution context must be very narrow: 'Dilution is a cause of action invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge their value.'"  Thane, 305 F.3d at 907 (citing Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 875 (9th Cir. 1999)).  A famous mark "must be truly prominent and renowned."  Id. at 907-08 (citing I.P. Lund Trand ApS v. Kohler Co., 163 F.3d 27, 46 (1st Cir. 1998)).  However, a mark may meet the famousness requirement if it reaches this very high level of recognition within its niche market.  Id. at 908.

Although neither party discusses the individual factors listed in § 1125(c)(1)(A)-(H), those factors clearly trend toward the conclusion that eAcceleration's Stop-Sign Image is not "famous and distinctive."  A stop sign is not an arbitrary or fanciful mark and, therefore, not particularly distinctive.  Further, eAcceleration made use of the Stop-Sign Image for only two years before Trend developed its anti-virus product packaging and, by eAcceleration's own admission, eAcceleration is a relatively small participant in the computer security software industry.  Pl.'s Mot., at 1.  While eAcceleration has spent money to advertise its products on television, its products only appear for sale on the internet, in contrast to the sale of Trend's products in retail stores.  And, as Trend notes in its response brief, the wide-spread use of stop signs in the computer security industry belies eAcceleration's contention that its Stop-Sign Image is distinctive.  Finally, eAcceleration's Stop-Sign Image was, and continues to be, unregistered.  Thus, without evidence that its Stop-Sign Image acquired a high level of prominence and recognition inside the computer security software industry, eAcceleration is not likely to prevail on its trademark dilution claim and has not demonstrated serious questions as to the merits.

ORDER  -15-

C. <u>Trend's Fair Use Defense</u>

Even assuming eAcceleration can make out strong claims for a likelihood of confusion or dilution, Trend contends that it has a fair use defense because the Stop-Sign Photo is not used as a trademark.  The fair use argument is raised twice in Trend's opposition brief and appears to be an affirmative defense.  <u>See</u> Def.'s Opp., at 8-10, 20.  Under § 33(b)(4) of the Lanham Act, "fair use" is a defense to infringement and is defined as "a use, otherwise than as a mark, of...a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services."  15 U.S.C. 1115(b)(4).  The fair use defense permits others to use protected marks in descriptive ways, but not as marks identifying their own products.  <u>See</u> <u>e.g.</u>, <u>Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.</u>, 125 F.3d 28, 30 (2d Cir. 1997) (defendant's use of words "Seal it with a Kiss" was a non-trademark use and did not infringe on plaintiff's mark (SEALED WITH A KISS) where it described actions customers were instructed to take in using product); <u>Car-Freshner Corp. v. S.C. Johnson & Sons, Inc.</u>, 70 F.3d 267, 270 (2d Cir. 1995) (defendant's use of pine-tree shape air freshener was a descriptive, non-trademark use because it was pine scented, sold only at Christmas, and came in packaging with defendant's separate identifying marks); <u>Volkswagenwerk Aktiengesellschaft v. Church</u>, 411 F.2d 350, 352 (9th Cir. 1969) (defendant car-repair shop's use of "Volkswagen" in advertising the type of automobiles it services was a fair use because it merely conveyed information without suggesting an affiliation to plaintiff).

Trend argues that its placement of the Stop-Sign Photo on its anti-virus product is simply descriptive of the product's function: stopping computer viruses from affecting its customers' computers.  Trend notes that it uses similar descriptive images for its internet security product (a padlock) and its anti-spyware product (a "gun sight" aimed at a person using binoculars).  <u>See</u> Chen Decl., at Exs. D-F.  Additionally, Trend provides the 28 examples of other products in the computer security industry using some form of a red

octagonal sign image in their advertising or packaging, arguing that a stop sign is a common

descriptive device.  See White Decl., at Exs. A-BB.  Finally, Trend argues that its placement

of other identifying trademarks ("PC-cillin" and "Trend Micro") on the packaging

sufficiently distinguishes its anti-virus software from eAcceleration's StopSign software.  In

response, eAcceleration argues that Trend's Stop-Sign Photo cannot constitute a fair use

because it is so prominently featured on the packaging and only vaguely suggests the

function of the product.  eAcceleration also notes that the 28 examples offered by Trend

generally relate to computer security software other than the anti-virus protection sold by

both eAcceleration and Trend.

Whether Trend's Stop-Sign Photo is a "fair use" is not a clear-cut issue, and it appears

to require a factual determination as to descriptiveness.  However, between the two, Trend

has the stronger argument.  While the Stop-Sign Photo is prominent, it does relate to the

function of the product and, when combined with Trend's unique marks, does not obviously

identify itself as trademark.  Moreover, stop signs are often used in the computer security

software industry, as illustrated by Trend's exhibits, even accepting eAcceleration's

contention that those examples are not narrowly limited to anti-virus software.  In sum, there

is a substantial probability that Trend could prevail on its fair use defense, which, in deciding

whether a preliminary injunction is warranted, must be counterbalanced against the

probability that eAcceleration might prevail on its unfair competition and trade dress claims

under the "likelihood of confusion" standard.

II.	Possibility of Irreparable Harm/Balance of Hardships

In the context of trademark infringement claims, if a plaintiff can establish "likelihood

of confusion," the plaintiff is ordinarily entitled to a presumption of irreparable injury.

Rodeo Collection Ltd. v. West Seventh, 812 F.2d 1215, 1220 (9th Cir. 1987).  However,

courts have held that a delay in seeking injunctive relief will undercut the presumption of

irreparable harm in trademark cases.  See, e.g., GTE Corp. v. Williams, 731 F.2d 676, 678

1   (10th Cir. 1984).  In this case, eAcceleration has not clearly established the likelihood of

2   confusion element and, even assuming it had, eAcceleration's delay of over one year in

3   bringing this motion for a preliminary injunction reverses any presumption in its favor.[4]  As

4   discussed above, eAcceleration appears to have the stronger case under the <u>Sleekcraft</u>

5   factors, but its claim is not so strong as to find that eAcceleration has "established"

6   likelihood of confusion, which is a factual question.  Additionally, as Trend argues in

7   response, Trend's packaging went into wide-spread use in mid-to-late 2004, and

8   eAcceleration did not write a cease and desist letter until January 2005.  Nine more months

9   passed before eAcceleration filed its complaint, and it did not make this motion for a

10  preliminary injunction until November 17, 2005.  Simply put, eAcceleration's decision to

11  delay approximately one year before bringing this motion contradicts its suggestion that it is

12  suffering urgent, continuing, and irreparable harm.  Moreover, if eAcceleration is ultimately

13  successful on one or more of its claims, its interest may be protected (at least in part) by the

14  recovery of money damages.  The Court finds that eAcceleration has not established a

15  possibility of irreparable harm.

16       The balance of hardships determination likewise falls in Trend's favor.  "In evaluating

17  the balance of hardships a court must consider the impact granting or denying a motion for a

18  preliminary injunction will have on the respective enterprises."  <u>Int'l Jensen v. Metrosound</u>

19  <u>U.S.A.</u>, 4 F.3d 819, 827 (9th Cir. 1993).  The <u>International Jensen</u> Court noted that the

20  relative size and strength of the parties may be pertinent to this inquiry, but also concluded

21  that the plaintiff's failure to vigorously protect its trademark claim was a factor.  <u>Id.</u>  In this

22  case, Trend states that its burden if the preliminary injunction is granted will include: (1)

23

24       [4] The Court recognizes that some portion of this delay was likely the result of attempts
     to resolve this matter without litigation, as described in the declarations provided by
25   eAcceleration.  Ballard Decl., at ¶ 15; Cumbow Decl., at ¶ 5-6.  However, those declarations
     also note that by the Spring of 2005 Trend indicated its unwillingness to cease in using the Stop-
26   Sign Photo.  <u>Id.</u>  Then, after waiting until September 2005 to file the Complaint in this matter,
     eAcceleration delayed over two additional months before bringing this motion for a preliminary
     injunction.

1   losses of sales (currently in excess of $400,000 per month) for approximately six to nine

2   months; (2) $100,000 in removal, repackaging, and shipping costs; and (3) the possibility

3   that it will be in breach of contract with its business partners.  Angus Decl., docket no. 13, at

4   ¶¶ 4-8.  Other than its reliance on the fact that it is a smaller company relative to Trend,

5   eAcceleration provides no specific examples of the hardship it might incur if the preliminary

6   injunction is not granted.  eAcceleration has not established that the "balance of hardships

7   tips *sharply* in its favor."  Clear Channel, 340 F.3d at 813 (emphasis added).

8   III.    Public Interest

9       eAcceleration briefly suggests that granting a preliminary injunction will advance the

10  federal policy in favor of protecting the public against deception or confusion.  This

11  argument is amorphous, especially because there is no suggestion that Trend is somehow

12  attempting to pass off inferior goods.  Accordingly, eAcceleration has not established that

13  there is a strong public interest in granting an injunction in its favor in this case.

14  **CONCLUSION**

15      As the moving party, eAcceleration has the burden of demonstrating either (1) a

16  likelihood of success on the merits and the possibility of irreparable injury, or (2) that serious

17  questions going to the merits were raised and the balance of hardships tips sharply in its

18  favor.  First, eAcceleration has not met its burden of demonstrating that there is a likelihood

19  of success on the merits of its trademark infringement, unfair competition, and trade dress

20  claims, particularly given the strength of Trend's fair use defense.  Nor has eAcceleration

21  established that it is likely to succeed as to its dilution claim, as there is little or no evidence

22  that its Stop-Sign Image is "famous and distinctive."  Even assuming eAcceleration could

23  show that it is likely to succeed on the merits, its delay in moving for this injunction

24  undercuts its contention that there is a real possibility of irreparable injury.  Second, while it

25  appears that there are serious questions as to the merits of the "likelihood of confusion"

26  element of eAcceleration's unfair competition and trade dress claims, eAcceleration falls far

short of demonstrating that the balance of hardships tips "sharply" in its favor, offering little more than conclusory assertions in response to Trend's declaration that it could face financial losses in the millions of dollars if the PC-cillin anti-virus software must be pulled off store shelves and repackaged.  Plaintiff's motion for a preliminary injunction, docket no. 8, is DENIED.

IT IS SO ORDERED.

DATED this 3rd day of January, 2006.


Thomas S. Zilly
United States District Judge

ORDER   -20-